1999-NMCA-029

974 P.2d 1174

**DELTA AUTOMATIC SYSTEMS, INC., Diane Quintana, and Paul J. Quintana, Plaintiffs–Appellants,**

v.

**Wayne E. BINGHAM and Crider, Calvert & Bingham, P.C., Defendants–Appellees.**

**No. 18,849.**

Court of Appeals of New Mexico.

Dec. 10, 1998.

Certiorari Denied, No. 25,576, Feb. 17, 1999.

Robert Dale Morrison, Law Offices of Robert Dale Morrison, Albuquerque, Cynthia J. Patterson, Law Offices of Cynthia J. Patterson, Albuquerque, for Appellants.

John A. Klecan, Butt, Thornton & Baehr, P.C., Albuquerque, for Appellees.

## OPINION

HARTZ, Chief Judge.

{1}   Diane and Paul J. Quintana were the sole shareholders and officers of Delta Automatic Systems, Inc. (Delta), when Delta hired attorney Wayne E. Bingham to help it terminate its contract with Road Sprinkler Fitters Local Union No. 669 (the Union). Delta and the Quintanas (Plaintiffs) later sued Bingham and his law firm—Crider, Calvert & Bingham, P.C. (the Bingham Firm)—claiming that Bingham failed to take the action necessary to terminate the union contract.   Before trial the district court dismissed the Quintanas' individual claims on the ground that only Delta had a cause of action.   After Delta rested its case at trial, the district court granted Bingham and the Bingham Firm (Defendants) a directed verdict based on the statute of limitations. Plaintiffs appeal.   We affirm.

{2}   The district court properly dismissed the Quintanas' claim because they do not come within any exception to the general rule that shareholders have no cause of action against third parties for injury to their corporation.   Our affirmance of the directed verdict against Delta rests on the proposition that the limitations period for professional malpractice commences when the client knew or should have known the facts that form the basis for the claim, regardless of whether the client appreciated that the professional's conduct constituted malpractice.

## BACKGROUND

{3}   In 1985 Delta, a fire sprinkler installation business, signed a three-year contract with the Union.   The following year, however, the Quintanas decided that Delta was not competitive with other sprinkler companies because it was one of only two union shops left in the area.   On April 4, 1986, Delta retained Bingham to help it terminate its union contract.   Bingham was an experienced labor lawyer, with special expertise in the construction trades.   He represented a number of construction companies, including a sprinkler company that competed with Delta.   This other company had previously retained Bingham to help it terminate its union contract.

{4}   There was conflicting evidence at trial regarding what Bingham told the Quintanas at the April 4 meeting, at a follow-up meeting on April 7, and during the next twelve months.   The Quintanas' version was as follows: Bingham merely asked for background information at the two initial meetings and said that he would have to research the matter.   During the following year Bingham never called the Quintanas with the results of his research.   Instead, whenever they called for an update.   Bingham said that he was still researching the matter. Bingham told the Quintanas that he was working with another sprinkler company on the same problem and wanted to wait to see how that came out.   The Quintanas did not remember being told about any courses of action open to Delta.

{5}   Bingham, on the other hand, asserted that he laid out three options for Delta at their first meetings: (1) wait until the expiration of the current contract and then take action, (2) reopen the negotiations on the current contract to try to obtain more favorable terms, or (3) take steps to repudiate the current contract immediately.   Bingham gave the Quintanas a sample of a letter he would need from each of Delta's union employees as a first step in repudiating the contract, if Delta chose the third option. Bingham called the Quintanas three times during the year, each time asking for a decision on the three options.   When he did not receive an answer, he assumed that Delta "was happy in the union."

{6}   The parties agree that on April 6, 1987, a year after the initial meeting, Bingham called Paul Quintana to tell him that a recent decision of the National Labor Relations Board, *John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375 (1987), made it more difficult for Delta to get out of its contract with the Union.   Paul understood the new ruling to

mean that Delta was "stuck in the union." Paul testified that he was "upset" and "devastated" by this news.

{7} The next year Delta signed another three-year union contract. Bingham continued to represent Delta and the Quintanas personally in various matters, including drawing up the Quintanas' wills.

{8} In April 1989 the Quintanas transferred their legal business from Bingham to Alan Wilson. Wilson then joined the law firm of Dines, Wilson & Gross, P.C. (the Dines firm), and another attorney at the Dines firm took over Delta's representation. Delta was experiencing serious labor problems at this time. The Quintanas asked the Dines firm to terminate the union contract if possible. They were advised, however, that Delta could not terminate the contract and that Delta should file for bankruptcy. In November 1991 the Quintanas consulted Nicholas J. Noeding, a labor lawyer. With Noeding's assistance Delta terminated its union contract in 1992. Delta did not file for bankruptcy; in fact, it began to enjoy financial success.

{9} By April 1992 Noeding had contacted some attorneys who pursue malpractice claims because he had decided that Plaintiffs had a potential malpractice claim against the Dines firm for failing to terminate the 1988 union contract and for making other alleged mistakes while handling Delta's labor matters. In August 1992, after reviewing Defendants' files pertaining to Delta, Noeding suggested that Delta might also have a cause of action for malpractice against Defendants. Plaintiffs filed a malpractice claim against the Dines firm on October 25, 1995, and amended the complaint to include Defendants on June 10, 1996. The complaint alleged financial damage to Delta and damages personal to the Quintanas, including loss of credit and emotional distress.

{10} Before trial the district court dismissed the Quintanas' individual claims, but it denied Defendants' motion for summary judgment based on the statute of limitations. At the close of Delta's case the court directed a verdict in favor of Defendants on statute-of-limitations grounds.

## DISCUSSION

### A. *Shareholders' Claims*

{11} Defendants filed a pretrial motion to dismiss the Quintanas' personal claims on the ground that any cause of action for malpractice belonged only to Delta. The district court granted the motion, apparently on the basis that the alleged malpractice arose out of Defendants' representation of Delta, not the Quintanas. We affirm the district court's decision on this issue.

{12} On appeal the Quintanas challenge the procedural fairness of the dismissal. Our review, however, discloses no abuse of discretion by the district court in handling the motion. We therefore turn to the merits.

{13} On a motion to dismiss, the court must accept the allegations of the complaint as true. *See Sanders v. Estate of Sanders,* 1996–NMCA–102, ¶ 16, 122 N.M. 468, 927 P.2d 23. If the allegations can support a cause of action, the motion to dismiss must be denied. *See id.* ¶ 6. The Quintanas claimed that Defendants harmed them personally by failing to terminate the 1985 union contract. They contended that constant labor problems caused damage to their personal credit standing, inability to maintain their standard of living, and emotional distress.

{14} In general, shareholders cannot bring individual claims against a third party for injuries that derive from damage to the corporation. "A corporation and a shareholder—even a sole shareholder—are separate entities, and a shareholder of a corporation does not have an individual right of action against a third person for damages that result because of an injury to the corporation." *Marchman v. NCNB Texas Nat'l Bank,* 120 N.M. 74, 81, 898 P.2d 709, 716 (1995). " '[A]lthough the stockholders of a corporation suffer when the corporation incurs a loss, only the corporation may vindicate its rights. An indirectly injured party should look to the recovery of the directly injured party, not the wrongdoer for relief.' " *Id.* (quoting *NCNB Nat'l Bank v. Tiller,* 814 F.2d 931, 937 (4th Cir.1987)). Our Supreme Court recognized only two exceptions to the general rule: "[1] when [shareholders] have suffered an injury separate and distinct from

the other shareholders or [2] when they are owed a special duty by the wrongdoer." *Marchman*, 120 N.M. at 82, 898 P.2d at 717.

{15} The Quintanas invoke the second exception, claiming that Defendants owed them a "special duty" because they had a personal attorney-client relationship with Defendants. In addition, they rely on *Leyba v. Whitley*, 1995–NMSC–078, 120 N.M. 768, 907 P.2d 172, for the proposition that they have personal causes of action because, as sole shareholders of Delta, they were the intended beneficiaries of Defendants' representation of Delta.

{16} We turn first to the "special duty" argument. The special duty arises when the wrongdoer owes a duty to the shareholder directly. *See Marchman*, 120 N.M. at 82, 898 P.2d at 717.

> There must be a direct injury to the shareholder in his or her individual capacity, independent of any duty to the corporation, before the shareholder is entitled to sue.
>
> . . . .
>
> When the alleged wrongful acts are directed at the corporation and not at the shareholders, the cause of action accrues to the corporation and not to the shareholders in their individual capacity [sic].

*Id.* The Quintanas contend that Defendants owed them a special duty because Bingham drew up their wills and represented them in business matters apart from his representation of Delta. It is true that as their personal lawyers, Defendants owed the Quintanas various duties. But the Quintanas allege no harm suffered by them as a result of a breach of those duties. In representing Delta, Defendants did not owe the Quintanas, as shareholders, any special duty above and beyond their duties to the corporation. This is so even though the Quintanas were the sole shareholders of Delta and Defendants knew that the Quintanas' livelihood depended on Delta's success. Our Supreme Court rejected similar claims in *Marchman*. The Court wrote:

> Plaintiffs allege that as a result of NCNB's conduct, [the corporation] was forced to lay off its employees and quit its business, that

[the shareholders (and shareholders of the shareholders) ] lost their investment in [the corporation], and that [the shareholders] suffered damage to their business reputations, ability to obtain credit, and livelihood. The injuries alleged are indirect damages suffered by the parties in their capacities as shareholders or employees of [the corporation] and derivative of the harm suffered by the corporation.

*Id.* at 83, 898 P.2d at 718. Like the alleged injuries to the plaintiffs in *Marchman*, the Quintanas' alleged injuries all derived from Defendants' alleged breach of duty to the corporation. For this reason, the "special duty" exception does not apply.

{17} The Quintanas' second argument is that they had the right to sue because they were the intended beneficiaries of Bingham's work for Delta. They rely on *Leyba*, which held that the attorney for the personal representative in a wrongful death case owed a duty of "reasonable care to ensure that the statutory beneficiaries actually receive the proceeds of any wrongful death claim." *Id.* 1995–NMSC–078, ¶ 28, 120 N.M. 768, 907 P.2d 172. Under the Wrongful Death Act a personal representative of the deceased may bring a tort action for wrongful death, but any proceeds of the lawsuit must pass to the statutory beneficiaries. *See* NMSA 1978, § 41–2–3 (1939). In *Leyba* the sole statutory beneficiary was a minor. The personal representative who brought the wrongful death case had improperly taken settlement proceeds for her own use. *See id.* ¶ 1. *Leyba* allowed the minor to sue the personal representative's attorney for failing to ensure that the minor received the full settlement proceeds.

{18} *Leyba* does not assist Plaintiffs. *Leyba* is limited to the special situation created by the Wrongful Death Act or to a similar situation, such as when an attorney agrees to represent a parent or next friend on behalf of a child. *See id.* ¶ 21 and n. 5. *Leyba* held that the attorney owed a duty of care to the minor because the only proper purpose the representative had in filing a claim under the Act was to benefit the statutory beneficiary. The representative's sole task with respect to the proceeds was to

distribute them to the beneficiary. *See id.* ¶ 17. *Leyba* distinguished personal representatives under the Act from traditional trustees, who have broad discretion in how they perform their tasks. *See id.* Corporate management likewise has broad discretion. *Leyba* involved an attorney's negligent failure to prevent the nominal client from breaching a non-discretionary fiduciary duty to the "real" client. In the case now before us, there can be no doubt that the real client was the corporation, not the corporate shareholders. The union contract was with Delta, not the Quintanas. We are confident that *Leyba* in no way undermined the longstanding propositions of corporate law reaffirmed in *Marchman* only four months earlier.

### B. *Statute of Limitations*

#### 1. *Standard of Review*

■ {19} Delta contends that the district court improperly took the statute-of-limitations issue from the jury by directing a verdict for Defendants at the close of Delta's evidence. Ordinarily, the jury, not the judge, should determine the facts regarding when a cause of action for professional malpractice accrues. *See Medina v. Fuller,* 1999–NMCA–011, ¶ 22, 126 N.M. 460, 971 P.2d 851. Thus, a district court presented with a motion for a directed verdict based on a statute of limitations must treat the motion as it would any other motion for directed verdict based on the merits.

■ {20} The district court cannot direct a verdict if evidence has been presented that could lead "reasonable minds" to a different conclusion. *Melnick v. State Farm Mut. Auto. Ins. Co.,* 106 N.M. 726, 728, 749 P.2d 1105, 1107 (1988). "To remove a case from the jury, it should be clear that the nonmoving party has presented no true issues of fact which that party has the right to have decided by his peers." *Id.* at 729, 749 P.2d at 1108. When the court considers a motion for a directed verdict at the close of the plaintiff's evidence, the court must review all the evidence that has been properly admitted at trial, including any evidence that the defendant introduced through cross-examination. If there is any uncontroverted evidence that is open to more than one inter-pretation, or if there is any conflicting evidence, the court must interpret the evidence in the light most favorable to the plaintiff. *See id.* at 728–29, 749 P.2d at 1107–08.

{21} In this case the district court heard eleven days of testimony before directing a verdict for Defendants. The court explained: "[T]here is no evidence from which reasonable minds could differ that [Plaintiffs] should have known that they had a cause of action more than four years prior to the time they filed a cause of action against [Defendants]." The court applied the proper standard. *See Brunacini v. Kavanagh,* 117 N.M. 122, 127, 869 P.2d 821, 826 (Ct.App.1993) ("Although the time when a party is deemed to have discovered, or reasonably should be held to have discovered the malpractice of an attorney, is generally a question of fact, nevertheless, where the undisputed facts show that Plaintiffs knew, or should have been aware of the negligent conduct on or before a specific date, the issue may be decided as a matter of law."). We apply that same standard in reviewing the district court's decision. *See Melnick,* 106 N.M. at 728–29, 749 P.2d at 1107–08 (standard is applicable to both trial and appellate courts).

#### 2. *The Limitations Period*

{22} The parties dispute whether legal malpractice is a cause of action governed by a three-year limitations period, *see* NMSA 1978, § 37–1–8 (1976) (personal injury claims), or by a four-year limit, *see* NMSA 1978, § 37–1–4 (1880) (claims "founded upon accounts and unwritten contracts ... and all other actions not herein otherwise provided for"). This appeal does not require us to decide the issue. Delta commenced its action against Defendants on June 10, 1996. As we shall explain below, the limitations period began before June 10, 1992. Therefore, either statute would bar the cause of action.

### C. *When the Cause of Action Accrued*

{23} The limitations period begins to run on a cause of action for professional malpractice once "(1) the client sustains actual injury and (2) the client discovers, or through rea-

sonable diligence should discover, the facts essential to the cause of action." *Sharts v. Natelson*, 118 N.M. 721, 724, 885 P.2d 642, 645 (1994) (footnote omitted); *see Jaramillo v. Hood*, 93 N.M. 433, 434, 601 P.2d 66, 67 (1979) (action for legal malpractice accrues when "actual loss or damage results" and "matters complained of are ascertainable and discoverable").

{24} The first prong of the test is not in controversy. Delta complains that its business suffered so long as it was burdened by the union contract. The injury caused by Defendants' alleged malpractice commenced no later than when Bingham reported to Delta in April 1987 that Delta was "stuck in the union."

{25} The dispute concerns the second prong. The directed verdict was proper only if every reasonable trier of fact would have found that prior to June 10, 1992. Delta had discovered, or could have discovered by reasonable diligence, the facts essential to its claims.

{26}Delta rests its malpractice cause of action on two claims: (1) that Defendants negligently failed to terminate Delta's union contract during the ten-month period between April 1986, when Delta hired them to perform the task, and February 1987, when *Deklewa* was decided by the NLRB; and (2) that Defendants had a conflict of interest in representing both Delta and another sprinkler company that Defendants had helped to get out of a union contract. We will first address Delta's assertion that its negligence claim did not accrue until July or August of 1992, when Noeding suggested to Plaintiffs the possibility of a malpractice case against Defendants.

{27} The facts forming the basis for Noeding's opinion were known to Delta long before it hired Noeding. Delta knew that it had requested Bingham to work on terminating the union contract, knew when it had made that request, and knew the result of Bingham's work. Indeed, only two facts were necessary for Noeding's opinion that Defendants committed malpractice: (1) the date of Delta's request to Bingham and (2) the failure to terminate the union contract by

the date of the *Deklewa* opinion. Noeding's testimony at trial indicated that a competent labor lawyer could have readily terminated Delta's contract with the Union during the ten months between the time Bingham was allegedly asked to perform the task and the date of the *Deklewa* decision. Delta's contention that it did not know the requisite "essential facts" until Noeding reviewed Defendants' file in August 1992 is untenable. According to the evidence offered at trial, the file did not reveal any new facts indicating a breach of duty.

{28} Delta contends, however, that the limitations period did not commence until it knew that Defendants were negligent. It asserts that before Noeding gave his opinion, the Quintanas had no idea how long legal research should take or whether Bingham actually could have terminated the contract during the ten months before *Deklewa* was decided. In short, Delta claims that the limitations period did not begin until an expert advised it that Bingham's work was beneath the standard of care, even though Delta had known for some time all the facts about Bingham's work that formed the predicate for the expert's opinion.

{29} Delta cites *Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor*, 115 N.M. 159, 848 P.2d 1086 (Ct.App.1993), to support its position. In *Hyden* we stated:

> To recover on a claim of legal malpractice based on negligence, a plaintiff must prove three essential elements: (1) the employment of the defendant attorney; (2) the defendant attorney's neglect of a reasonable duty; and (3) the negligence resulted in and was the proximate cause of loss to the plaintiff.

*Id.* at 162–63, 848 P.2d at 1089–90. Delta's position appears to be that the limitations period cannot begin until it knows, or should know, all these elements of the cause of action, one of which is "neglect of a reasonable duty." But the essential elements of a negligence cause of action are not the same as the facts that would form the basis of a suit. To commence the limitations period, "a plaintiff need not know that the injury constitutes a breach of the legal standard of care; it is sufficient if plaintiff is on notice of the

724

facts constituting the cause of action." *La-Mure v. Peters*, 1996–NMCA–099, ¶ 27, 122 N.M. 367, 924 P.2d 1379. "It is not necessary that the client have the expertise to judge whether the attorney acted beneath the standard of professional care, so long as the pertinent facts are available to the client." *Sharts v. Natelson*, 118 N.M. 330, 343, 881 P.2d 690, 703 (Ct.App.1993) (Hartz, J., dissenting), *rev'd*, 118 N.M. 721, 885 P.2d 642 (1994).

"The key consideration under the discovery rule is the factual, not the legal, basis for the cause of action. The action accrues when the plaintiff knows or should know the relevant facts, whether or not the plaintiff also knows that these facts are enough to establish a legal cause of action. Were the rule otherwise, the discovery rule would postpone accrual in every case until the plaintiff consults an attorney."

*Coslett v. Third Street Grocery*, 117 N.M. 727, 735, 876 P.2d 656, 664 (Ct.App.1994) (quoting *Allen v. State*, 118 Wash.2d 753, 826 P.2d 200, 203 (1992) (en banc)).

{30} Hence, the limitations period commenced by April 6, 1987, when Bingham informed Delta that a recent NLRB decision—*Deklewa*—would prevent him from terminating the union contract. This result creates no grave injustice. Even if Delta did not know that Bingham had committed malpractice, it knew (assuming its allegations to be true) that he had failed in the course of a year to perform the assigned task of terminating the union contract, a task that had now apparently been precluded by *Deklewa.* Depending on which statute of limitations applied, Delta still had either three years or four to inquire regarding whether Bingham's failure constituted malpractice and to file suit accordingly. We note that Delta has not argued that the limitations period was tolled while Bingham continued to represent Delta. *See Sharts*, 118 N.M. at 726, 885 P.2d at 647 (expressing reservations about "continuous representation" doctrine). But in any event, that argument would not aid Delta on the facts of this case; Delta filed suit against Defendants more than nine years after the *Deklewa* decision and some seven years after Delta hired Wilson to take over labor matters from Bingham. Because reasonable minds cannot disagree that by April 6, 1987, Delta knew all the facts underlying its claim for negligence, we hold that under either Section 37–1–8 or Section 37–1–4, that claim was time-barred when it was filed in 1996.

{31} As for the conflict-of-interest claim, Delta has waived any contention that the claim was filed within the limitations period. Although Plaintiffs' brief in chief on appeal addresses the merits of the conflict-of-interest claim and also argues that the limitations period had not expired on the negligence claim, we find no discussion regarding when the limitations period commenced on the conflict-of-interest claim. Defendants' answer brief specifically addresses the issue, arguing that Plaintiffs knew all the essential facts regarding their conflict-of-interest claim by 1987. Yet, Plaintiffs' reply brief contains no response to this argument. In this circumstance, such a failure to respond constitutes a concession on the matter. *See Anderson v. Jenkins Const. Co.*, 83 N.M. 47, 49, 487 P.2d 1352, 1354 (Ct.App.1971); *D'Ardenne v. Strawbridge & Clothier, Inc.*, 712 A.2d 318, 326 (Pa.Super.Ct.1998); *Sasseen v. State Bd. of Equalization*, 363 P.2d 252, 253–54 (Okla.1961) (per curiam). This Court has no duty to search the record or research the law to "defend" in a civil case a party that fails to defend itself on an issue. We therefore affirm the district court's directed verdict on the conflict-of-interest claim.

{32} Having affirmed the dismissal of the Quintanas' claims and the directed verdict against Delta, we need not address Plaintiffs' arguments concerning damages.

III. *CONCLUSION*

{33} We affirm the judgment entered below.

{34} **IT IS SO ORDERED.**

THOMAS A. DONNELLY and LYNN PICKARD, JJ., concur.